# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2022 KA 1008

STATE OF LOUISIANA

VERSUS

DARRYL BRAGGS, JR.

Judgment Rendered: **MAR 0 6 2023**

* * * * * *

On Appeal from the Eighteenth Judicial District Court
In and for the Parish of West Baton Rouge
State of Louisiana
Docket No. 211014
Honorable Tonya S. Lurry, Judge Presiding

* * * * * *

Mary Constance Hanes
New Orleans, Louisiana

Counsel for Defendant/Appellant
Darryl Braggs, Jr.


Antonio "Tony" Clayton
District Attorney
Plaquemine, Louisiana
Terri Russo Lacy
Assistant District Attorney
Port Allen, Louisiana

Counsel for Appellee
State of Louisiana

* * * * * *

BEFORE: McCLENDON, HOLDRIDGE, AND GREENE, JJ.

Holdridge J. concurs

**McCLENDON, J.**

The defendant, Darryl Braggs, Jr., was charged by amended grand jury indictment with one count of second degree murder while engaged in the perpetration of an assault by drive-by shooting (count I), a violation of LSA-R.S. 14:30.1(A)(1) or (A)(2), and one count of aggravated criminal damage to property (count III), a violation of LSA-R.S. 14:55.[1,2] He moved to suppress the use of his statements, but the motion was denied. Following a jury trial, the defendant was found guilty as charged on both counts by unanimous verdicts. On the charge of second degree murder, he was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. On the charge of aggravated criminal damage to property, he was sentenced to a concurrent term of twelve years at hard labor and was fined $10,000. The defendant now appeals challenging the denial of his motion to suppress and a ruling of the trial court allowing the State to use evidence of other crimes, wrongs, and acts committed by the defendant. For the following reasons, we affirm the convictions and sentences.

## FACTS

On November 22, 2020, at approximately 9:30 p.m., a home in Gonzales was struck by twenty-four or more bullets. At the time of the shooting, the home owner, Glenda Barker, as well as her grandson and her grandson's girlfriend, were at home. Barker's grandson was outside smoking a cigarette on the patio when the shooting started and was able to see a black four-door car in the road. Additionally, a neighbor heard the gunshots and saw a blue or black vehicle leave the scene after the shooting. No shots were fired from Barker's home.

The body of the victim, Jaleel Leonard, was recovered from Barker's driveway. He was wearing vinyl gloves and had a Glock 43 .9 mm handgun on his person. The police recovered twenty-seven shell casings fired from an AR-15 rifle and five shell casings fired from a .9 mm weapon in the area of the driveway.

---

[1] Count II charged Kameron Webb as a principal to second degree murder.

[2] Prior to trial, the defendant failed to object to lack of rearraignment, if any, or to the denial of an opportunity to enter a plea to the amended indictment. Accordingly, he is considered to have pled not guilty on all counts. See LSA-C.Cr.P. art. 555.

Dr. Christopher Tape testified concerning the autopsy of Leonard. He stated Leonard died from blood loss from a "penetrating distant gunshot wound" to his right back, and that the letters "YNW" were tattooed on his arm. Subsequent investigation revealed the letters were the initials of a gang called "Young and Wreckless."

Leonard's grandmother advised the police that the defendant was the last person with whom she saw Leonard. She also advised the police that the defendant had picked up Leonard in a vehicle consistent in description with the vehicle seen at the crime scene. Additionally, cell phone records placed the cell phones of the defendant and Leonard in the area of the crime approximately three minutes before the incident was reported.

In two recorded interviews, the defendant placed himself at the crime scene with Leonard. Following the first interview, the defendant called Dequan Johnson and essentially instructed him to destroy a cellphone which belonged to the grandmother of a YNW gang member. During the second interview, the defendant stated that Leonard exited the vehicle and "just start[ed] shooting." The defendant confessed that he fired twice and that he "[thought he] hit [Leonard]." Shortly thereafter, the defendant was asked directly whether one of the rounds he fired "hit [Leonard,]" and the defendant responded, "[h]ad to be." The defendant was also asked whether he saw anyone in the home "shooting back." He stated that he remembered seeing two flashes, but "it could have been anything."

### MOTION TO SUPPRESS STATEMENTS

In assignment of error number 1, the defendant contends the trial court abused its discretion in denying his motion to suppress his December 8, 2010 and December 10, 2020 statements. He argues his statement that he fired two shots and might have hit Leonard was induced by promises made to him by detectives on December 8, 2020.

Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451. Confessions obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, are involuntary and inadmissible as a matter of constitutional law. Nevertheless, the voluntariness of a confession is determined by the totality of the circumstances, with the

3

ultimate focus on whether the statement was the product of an essentially free and unconstrained choice or the result of an overborne will. **State v. Hills**, 2022-0549 (La.App. 1 Cir. 11/4/22), 2022 WL 16707743, *4. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his **Miranda** rights. See **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A confession of guilt induced by a government promise of immunity is "coerced" and may not be used against the accused. **State v. Turner**, 2016-1841 (La. 12/5/18), 263 So.3d 337, 399, cert. denied, ___ U.S. ___, 140 S.Ct. 555, 205 L.Ed.2d 355 (2019).

Since the general admissibility of a confession is a question for the trial court, its conclusions on the credibility and weight of the testimony are accorded great weight and will not be overturned unless they are not supported by the evidence. However, a trial court's legal findings are subject to a *de novo* standard of review. The trial court must consider the totality of the circumstances in determining whether a confession is admissible. The direct testimony of the interviewing police officer can be sufficient to prove a defendant's statement was freely and voluntarily given. **Hills**, 2022 WL 16707743 at *4.

The burden of proof is generally on the defendant to prove the grounds recited in a motion to suppress evidence. See LSA-C.Cr.P. art. 703(D). However, this is not the case with the motion is to suppress a confession. Rather, with respect to a motion to suppress a confession, the burden of proof is with the State to prove the confession's admissibility. See LSA-C.Cr.P. art. 703(D). The State must prove beyond a reasonable doubt that the confession was made freely and voluntarily. Therefore, if the defendant alleges police misconduct in eliciting a confession, the State must specifically rebut those allegations. **Hills**, 2022 WL 16707743 at *4.

In his December 8, 2020 recorded interview, the defendant conceded he drove Leonard and two other men to the crime scene, but denied knowing they would fire guns there and denied knowing who shot Leonard. In his December 10, 2020 recorded interview, the defendant stated he "shot two times" and one of the rounds had to have hit Leonard.

The State gave notice it would request a pretrial determination of the admissibility of inculpatory statements made by the defendant to law enforcement officers in his recorded

4

interviews.  Thereafter, the defendant moved to suppress the confessions/admissions, alleging they were involuntary because they were induced by promises.

At the hearing on the motion to suppress, the State introduced into evidence **Miranda** rights forms and transcripts of the defendant's statements.  The defense made no challenge to the defendant's waiver of his **Miranda** rights prior to making the statements.

West Baton Rouge Parish Sheriff's Department Detective Christopher Bouquet testified at the hearing on the motion to suppress.  He conducted the initial questioning of the defendant on December 8, 2020.  West Baton Rouge Parish Sheriff's Department Detectives Chris Conaway and Kevin Cyrus also participated in the interview.

The following colloquy occurred during the December 8, 2020 interview:

Bouquet:    I know it's an accident.  Of course it was an accident.  This is your boy.

Conway:    Months.  We're talking months here.

Bouquet:    If that much.  Matter of fact, I'm – honestly, I'm not going to lie.  You'll probably do a few months, they're going [to] give you time served, put you on probation for a few years.  I don't see a home arrest in it.  I don't see that.  My thing is this.  Okay?  Amongst everything else, I know it's an accident.  I'm telling you it's an accident.

When it goes down to trial, I'm going to be the one to say, yeah, it's an accident.  I'm the one that's going [to] do that.  You need to tell me, explain to me how it was an accident.

Detective Bouquet stated he was not promising the defendant anything, but rather explaining to him the possibilities of what could happen based on the detective's belief that Leonard was shot accidentally.  Detective Bouquet testified, "I was explaining to him how I felt about the situation.  I wasn't making any promises at all."  The State asked Detective Bouquet if he ever told the defendant he was going to go home.  Detective Bouquet answered negatively.  The State asked Detective Bouquet if he felt he had the authority to "speak such language."  Detective Bouquet again answered negatively and explained:

Bouquet:    Because I don't handle trial matters.  I don't handle sentencing, or I don't handle any form of that.  I'm simply there to identify stuff, make arrests, and bring it all to the district attorney's office.

State:    So you weren't promising him nothing in exchange for something that you wanted him to tell you?

Bouquet:    Correct.

5

The defendant did not tell Detective Bouquet anything following the colloquy.

According to Detective Bouquet, the fact that Detective Cyrus was African-American helped the defendant better relate to him. Indeed, while being questioned by Detective Cyrus on December 8, 2020, the defendant repeatedly stated he felt more comfortable with him. Detective Cyrus told the defendant, "I'm telling you, we have a warrant for your arrest. You [are] going [to] get booked here today. The question is how long you stay here. You going – You [are] going [to] get booked. You want me to lie to you?" The defendant answered negatively.

The State pointed out that Detective Cyrus directly told the defendant he would be booked after the interview. Further, in response to questioning by the State, Detective Bouquet indicated the defendant's inculpatory statement came after Detective Cyrus' statement. Thereafter, after asking Detective Cyrus if he could smoke another cigarette, the defendant stated, "I just, I want to talk to you though." Detective Cyrus replied, "[t]hat's fine bro. You know, I mean, these guys are the ones working the case." Detective Cyrus advised the defendant that he and his vehicle were seen by a witness because he stopped under a light. Detective Cyrus also told the defendant that cell phone records placed Leonard's phone in the defendant's vehicle following the incident and provided the location of the defendant's vehicle after he fled from the scene.

The trial court denied the motion to suppress the December 8, 2020 and December 10, 2020 statements. The court held the statements were given knowingly, freely, and voluntarily and after advice of the **Miranda** warnings. The court found the defendant's inculpatory statements were elicited from the evidence presented to him by Detective Cyrus rather than from any statements made by Detectives Bouquet and Conway. The court noted the defendant's rapport with Detective Cyrus and the incriminating evidence with which he confronted the defendant. The court did not believe Detective Bouquet lied to the defendant when he told him he believed it was an accident that the defendant killed Leonard.

We find no reason to disturb the ruling of the trial court. The trial court's conclusions on the credibility and weight of the testimony are supported by the evidence of the rapport Detective Cyrus developed with the defendant and the incriminating evidence Detective

6

Cyrus presented to him prior to the confession. The State proved beyond a reasonable doubt that the confession was made freely and voluntarily and specifically rebutted the allegations of police misconduct in eliciting the confession. See **Hills**, 2022 WL 16707743 at *4. Considering the totality of the circumstances, the confession was the product of the essentially free and unconstrained choice of the defendant rather than his overborne will. See **Hills**, 2022 WL 16707743 at *6 ("a confession is not rendered inadmissible because officers 'exhort or adjure' an accused to tell the truth, provided the exhortation is not accompanied by an inducement in the nature of a threat or which implies a promise of reward.").

This assignment of error is without merit.

## OTHER CRIMES EVIDENCE

In assignment of error number 2, the defendant contends the trial court abused its discretion in allowing the State to introduce LSA-C.E. art. 404(B) evidence to show that he was a member of a gang and as such would have knowledge of certain facts, including that a crime was going to be committed, when he drove Leonard and two other men to the crime scene. He argues that, although "he would have had an idea what the gang members were doing[,]" he merely socialized with members of YNW, including Leonard, and enjoyed the gang's non-criminal activities.

Evidence of other crimes, wrongs, or acts committed by the defendant is generally inadmissible because of the substantial risk of grave prejudice to the defendant. It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. **State v. Calloway**, 2018-1396 (La.App. 1 Cir. 4/12/19), 276 So.3d 133, 147, writ denied, 2019-00869 (La. 1/20/21), 308 So.3d 1164, citing LSA-C.E. art. 404(B)(1). Even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. The State bears the

7

burden of proving that the defendant committed the other crimes, wrongs, or acts. **State v. Calloway**, 276 So.3d at 147.

Other crimes evidence is admissible under the integral act exception (formerly known as *res gestae*) when the evidence relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. Thus, evidence of other crimes forms part of the *res gestae* when said crimes are related and intertwined with the charged offense to such an extent that the State could not have accurately presented its case without reference to the other crime. The *res gestae* doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime, if a continuous chain of events is evident under the circumstances. Integral act evidence in Louisiana incorporates a rule of narrative completeness without which the State's case would lose its narrative momentum and cohesiveness. **State v. Calloway**, 276 So.3d at 147.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. LSA-C.E. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. LSA-C.E. art. 403. A trial court's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. **Calloway**, 276 So.3d at 147-48.

Louisiana Revised Statutes 15:1404(A) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, which has as one of its primary activities the commission of one or more of the criminal acts enumerated in [LSA-R.S. 15:1404(B)(1)-(13)] or which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Louisiana Revised Statutes

8

15:1404(B) defines "pattern of criminal gang activity" as "the commission or attempted commission of two or more of the following offenses, provided that the offenses occurred within a three-year period, and the offenses are committed on separate occasions or by two or more persons[.]" Louisiana Revised Statutes 15:1404(B) includes among its enumerated offenses: first or second degree murder; illegal use of weapons or dangerous instrumentalities; assault by drive-by shooting; and aggravated criminal damage to property. LSA-R.S. 15:1404(B)(3), (B)(5), (B)(9) & (B)(11).

Prior to trial, the State gave notice of its intent to use evidence at trial of other crimes, wrongs, and acts committed by the defendant. The State set forth that it intended to prove the defendant was a member of the criminal street gang YNW and weapons used in the instant offense corresponded to weapons used or possessed by known YNW gang members. Following a hearing, the trial court found the evidence admissible and granted the notice of intent. Thereafter, this Court reversed the ruling. **State v. Braggs**, 2022-0074 (La.App. 1 Cir. 1/25/22), 2022 WL 215161 (Wolfe, J., dissenting). Subsequently, the Louisiana Supreme Court reversed this Court and reinstated the ruling of the trial court. **State v. Braggs**, 2022-00185 (La. 1/26/22), 332 So.3d 666.

Louisiana State Police Trooper Alexander Nezgodinsky testified at the 404(B)(1) hearing. The defense stipulated he was an expert in criminal gang activity and to the existence of a gang called "YNW." Trooper Nezgodinsky first learned about YNW in 2018 while working with criminal intelligence. YNW broke off from the "Never Broke Again" gang and operated on the west side of the Mississippi River in Point Coupee and West Baton Rouge Parishes. Trooper Nezgodinsky was particularly concerned with YNW due to its extreme violence and the fact that many of its members were in their late teens.

Trooper Nezgodinsky provided a Louisiana State Police form based upon FBI criteria to local agencies to document groups of individuals as street gangs or as organized crime. He identified street gang/organized crime forms prepared for Darryl Braggs, Jr., the defendant, Tyzontae Davis, Kameron Webb, Dequan Johnson, and Leonard, the victim. Following months of investigation, Trooper Nezgodinsky learned that Johnson was the leader of YNW, Davis was the gun supplier of YNW and had a reputation for being one of the more violent members, and Leonard was known to commit burglaries, particularly car

9

burglaries. Additionally, Trooper Nezgodinsky testified that Xavier Joseph, known as "Big Billy," was reputed to supply narcotics to YNW.

Trooper Nezgodinsky identified a photograph depicting the defendant standing next to Johnson and Leonard. The men were wearing the same clothes they wore in a music video. Webb also appeared with the men in the video. In another video, the defendant appeared with Johnson, Leonard, Webb, and Davis.

According to Trooper Nezgodinsky, through community input, he concluded that the defendant was associated with YNW. Trooper Nezgodinsky noted multiple videos established a connection between the defendant and YNW, with the defendant in the videos and carrying a gun. Trooper Nezgodinsky stated that between making the "shoots of the videos," the defendant, Johnson, and Leonard posted on Facebook. Trooper Nezgodinsky testified:

> So it's just [the] totality of [the defendant's] behavior, if I may, on video and off video, through the law enforcement that documented his activities, not necessarily criminally, but he's always associated or in [the] presence of other members of the gang that were arrested. The community confirmed not specifically I was asking about [the defendant], but they confirmed that he's associated, where he hangs out, the houses, the vehicles they drive and the people he's constantly associated with.[3]

The State introduced into evidence a jail log identifying the defendant's PIN number and a recording of a telephone call he made from jail. In the jail call, the defendant tells Johnson, another member of YNW, "[w]hoever got 3950, man, get rid of that phone. That's how they got me." Trooper Nezgodinsky explained the significance of the call as follows:

> [T]hat's the first call [the defendant] makes after doing an interview, and he calls the leader of the group and he tells him to destroy the evidence that got [the defendant] arrested. [The defendant] didn't call his mama. He didn't call his significant other. He calls [Johnson]. I think, based on my training and being a cop for 18 years, that's significant.

---

[3] Additionally, Trooper Nezgodinsky testified a Louisiana court had determined that Jaquan Battley was a member of YNW. Battley had no prior criminal record, but was subsequently convicted of second degree murder. According to Trooper Nezgodinsky, "Free JJ" was a video, documentary, and song based on the killing of "Sir James" by Battley. The defendant appeared in "Free JJ." Trooper Nezgodinsky stated, in addition to community input and the defendant's involvement in gang videos, he determined the defendant was involved with YNW on the basis of the defendant's knowledge, specifically "[the defendant] knows the gang, how they operate, the crimes they commit. He's involved in it."

According to Trooper Nezgodinsky, the defendant was part of YNW. He noted, "[the defendant] was the driver when they pulled up at the house. He took his mama's car. He had knowledge." Trooper Nezgodinsky testified:

> [The defendant] basically says that he was there, and he accidentally shot his buddy. To me, he has the knowledge because this gang does not operate without knowledge or knowing. He knew why he was there. He knew what [Leonard] specializes in. He knew who are the people involved in the vehicle, the other two back passengers, but based on his gang lifestyle and love for the gang, he's not going to be a rat or a snitch. They don't snitch on each other. They don't go and do stuff out of the blue. This was organized, planned activity that went sideways. He didn't mean to shoot and kill anybody. He didn't mean to kill, let's say [Leonard]. They reacted and they started shooting, and that's what happened. But he had knowledge, how they operate. He's part of this lifestyle.

Trooper Nezgodinsky also cited the ballistics evidence as relevant to the defendant's knowledge and association with YNW. Trooper Nezgodinsky noted four individuals were present in the vehicle when the incident occurred. The defendant was the driver and fired five rounds from a .9 mm handgun. The shell casings collected on the scene and the bullet that killed Leonard matched the .9 mm found in the custody of Davis, a member of YNW. Additionally, two AR-15 style rifles were used in the incident. The rifle that matched 17 shell casings at the crime scene was recovered in the possession of Webb. The other rifle, a .223 caliber, was used to commit a homicide in New Roads in 2021. Johnson and Davis were both indicted in connection with that homicide.

In a post-hearing memorandum, the State the argued that Article 404(B) evidence showed: the defendant's affiliation with YNW; his knowledge of the criminal activity committed in the instant case; his preparation and plan to commit the murder, or at the very least, the drive-by shooting in the instant case; and his motive as an affiliate of YNW. Additionally, the State argued the defendant's jailhouse call to the leader of YNW, Dequan Johnson, a/k/a "Quarterbaby," made immediately following the defendant's December 8, 2020 interview, informing Johnson the defendant had been caught with evidence of cell location and advising Johnson to get rid of the cellphone was further evidence of the defendant's membership in, and affiliation with, YNW.

There was no clear abuse of discretion in the ruling on the admissibility of the evidence concerning the defendant's association with YNW. To the extent, if any, that being a member of a gang was other crimes evidence or evidence of bad acts, such

evidence was properly allowed at trial. See **State v. Lawson**, 2018-0382 (La.App. 1 Cir. 11/8/18), 2018 WL 5876815, *8, writ denied, 2018-2048 (La. 5/20/19), 271 So.3d 1272. The State's theory was that the defendant committed second-degree murder under LSA-R.S. 14:30.1(A)(1), by killing Leonard with the specific intent to kill or to inflict great bodily harm, or, in the alternative, that the defendant was a principal to second degree murder by assault by drive-by shooting under LSA-R.S. 14:30.1(A)(2). As used in LSA-R.S. 14:30.1(A)(2), the term "drive-by shooting" means the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person. LSA-R.S 14:37.1(C). Although the defendant conceded he drove himself and three people to the crime scene, and his passengers fired shots on a nearby house, the defendant claimed he was surprised when the shooting began. Evidence of the defendant's association with Leonard and other known gang members by appearing in photographs and videos with them, by carrying weapons around them, by posting messages in social media with them, and by advising them to destroy evidence was not impermissible other crimes evidence to show bad character or a criminal disposition; rather, it had independent relevance to the issues of preparation, plan, and knowledge. An expert on gang activity testified that gangs "don't go and do stuff out of the blue" and that the assault was "organized, planned activity." Accordingly, the prejudicial effect of the challenged evidence, if any, was outweighed by its probative value. See **State v. Lawson**, 2018 WL 5876815 at *8 ("the State used the FabBoys associations to show motive of why Hart was killed. The evidence of the FabBoys group and its affiliations was, therefore, relevant and properly admissible under [LSA-C.E.] art. 404(B).").

Moreover, even if the other crimes evidence was inadmissible, the admission of such evidence was harmless error. See LSA-C.Cr.P. art. 921. The erroneous admission of other crimes evidence is a trial error subject to harmless-error analysis on appeal. **State v. Swan**, 2018-0320 (La.App. 1 Cir. 12/17/18), 2018 WL 6599023, *13, writ denied, 2019-0151 (La. 5/20/19), 271 So.3d 1270. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." **Sullivan v. Louisiana**, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). The defendant confessed to shooting Leonard during the perpetration of an assault by drive-by

12

shooting. Even under the defendant's theory that when he shot Leonard from the car he had no intent to shoot *him*, he fired from the car with the intent to kill, cause harm to, or frighten another person. Accordingly, error, if any, in allowing the other crimes evidence to be presented to the jury was harmless. LSA-C.Cr.P. art. 921, **Sullivan**, 508 U.S. at 279, 113 S.Ct. at 2081; **Swan**, 2018 WL 6599023 at *13.

This assignment of error is without merit. For the foregoing reasons, the convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED.**